## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JENNIFER LEE SARTIN,**       ) | |
|       ) | |
|      **Plaintiff,**       ) | |
|       ) | |
| **v.**       ) | **Case No. 12-CV-75-PJC** |
|       ) | |
| **CAROLYN W. COLVIN,**       ) | |
| **Acting Commissioner of the**       ) | |
| **Social Security Administration,[1]**       ) | |
|       ) | |
|      **Defendant.**       ) | |

### OPINION AND ORDER

Claimant, Jennifer Lee Sartin ("Sartin"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Sartin appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Sartin was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Sartin was 30 years old at the time of the hearing on November 29, 2010.  (R. 38-39).

Sartin last worked in fast food in September 2008, and she quit work due to severe pain and

depression.  (R. 40).

Sartin testified that she went to bed around 9:00 or 10:00 p.m. and got up around 6:00

a.m.  (R. 41).  About 7:00 a.m., she took several medications that were prescribed for her.  *Id.*

Some of the medications, including Lyrica, made her sleepy.  *Id.*  She would then take a nap due

to the side effect of her medications and due to her pain.  (R. 42).  During this morning nap, she

would place a pillow between her knees, and she would use a heating pad as well.  *Id.*  This nap

might last for two to three hours, and she took a nap most days.  *Id.*  She took Lyrica again later

in the day, and she would again usually take a short nap.  (R. 43).  Her physician who treated her

for pain management, Dr. White, recommended that she prop up her legs during the day and that

she stretch often during the day.  *Id.*  The stretching exercises took about 20 minutes to do, and

she did them about three or four times a day.  (R. 44).

Sartin testified that her husband did all of the cooking and cleaning.  (R. 45).  She

testified that she did some chores, like washing dishes, doing laundry, and doing the shopping,

but her husband or other family members did most of it.  (R. 45-46).  She thought she could sit in

a chair for 30 minutes to an hour before needing to get up.  (R. 46).  She could stand for perhaps

15 to 20 minutes before needing to sit.  *Id.*  She could walk approximately 10 minutes before

needing to stop.  (R. 47).  She could lift about 10 pounds occasionally.  *Id.*  She drove a car.  *Id.*

Sartin presented as a new patient to the OU Physicians Clinic (the "OU Clinic") on

November 12, 2008 with chief complaints of depression and right arm pain.  (R. 247-50).  She

said that she had been in a car accident in 1995, injuring her right arm, and she had since had

four surgeries on the arm.  (R. 247).  Sartin said that she would like some pain medication, and she also asked for medication to assist with stress.  *Id.*  She was prescribed fluoxetine HCL and ultram.  (R. 249).  Sartin returned on December 3, 2008, saying that both the fluoxetine HCL and the ultram helped with her symptoms, but she sometimes took two of the ultram tablets for her right hand pain when the weather was cold.  (R. 240-43).  She was referred to physical therapy. (R. 242).  A note from January 2009 states that physical therapy worsened her pain.  (R. 251).

Sartin had a psychological evaluation at the OU Psychiatry Clinic on December 22, 2008. (R. 234-39).  The assessing physician's diagnoses on Axis I[2] were history of panic disorder without agoraphobia and major depressive disorder, recurrent, moderate.  (R. 237).  He assessed Sartin's Global Assessment of Functioning ("GAF")[3] as 58, with 70 as highest in past year.  *Id.* The physician continued the prescriptions of fluoxetine and ultram, and added propranolol for acute anxiety.  (R. 238).

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32.  The GAF scale is from 1-100.  A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

At a follow up appointment with the OU Psychiatry Clinic on January 12, 2009, Sartin's diagnosis of depression was changed to reflect mild depression, and her GAF was scored as 65. (R. 223-26).  Her medications were continued, and her fluoxetine was increased because Sartin had not experienced full remission of her depressive symptoms.  (R. 226).

At the OU Clinic on January 21, 2009, Sartin returned requesting additional pain medication to control her right arm pain.  (R. 218-22).  Sartin was prescribed a limited number of Lortab to use when she experienced severe pain.  (R. 221).

Sartin was seen at Alternative Medicine of Tulsa on February 6, 2009.  (R. 289).  Her chronic pain in her right wrist and forearm was noted, as well as occasional pain in her neck.  *Id.* She was given a referral to a pain specialist and prescribed Lortab in the meantime.  *Id.*  The date of the next record is not clear, but it reflects that Sartin had presented to an emergency room for an injection due to severe pain that would not allow her to sleep.  (R. 288).  It appears that prescriptions of trazadone and Flexeril were added to her prescription for Lortab.  *Id.*

Sartin was seen at Alternative Medicine of Tulsa on March 2, 2009 to review her imaging studies.  (R. 287).  This record states that Sartin had tenderness at all 18 points for fibromyalgia. *Id.*  The CT scan of her neck was normal.  *Id.*  Assessments were back strain, neck strain, fibromyalgia, chronic pain, chronic right arm pain, and pain with nerve damage.  *Id.*  Lyrica was prescribed, and trazadone was continued.  *Id.*  On March 16, 2009, Sartin reported that the Lyrica was helping and she was not waking up in as much pain.  (R. 286).  It was again noted that she was tender at all 18 points for fibromyalgia.  *Id.*  On March 27, 2009, assessments were right wrist pain with nerve pain, insomnia, fibromyalgia, anxiety, and depression.  (R. 285).  On April 14, 2009, it was reported that Sartin was in a lot of pain, was wearing a neck brace, and was out of Lyrica.  (R. 284).  Lyrica and trazadone were increased, and Flexeril was prescribed.  *Id.*

4

At an appointment with the OU Psychiatry Clinic on February 9, 2009, Sartin's propranolol was increased to deal with anxiety.  (R. 213-17).  Sartin was seen again on March 9, 2009, and her medications were continued, and her GAF was assessed as 69.  (R. 208-12).  On April 21, 2009, Sartin said that her depression was worse, and her diagnosis of depression was changed to reflect that it was moderate.  (R. 203-07).  Anxiety disorder not otherwise specified was added.  (R. 204).  Her GAF was scored as 60.  *Id.*  The physician said that he would attempt to obtain insurance approval for a prescription of Cymbalta.  (R. 205-06).

At a May 14, 2009 appointment with the Alternative Medicine of Tulsa clinic, Sartin had full range of motion in her extremities, with sensory loss in her right arm.  (R. 283).  Assessments were chronic pain with nerve damage and fibromyalgia.  *Id.*  It appears that Sartin was referred to a neurologist, and her prescriptions were refilled.  *Id.*

Sartin was seen at the OU Psychiatry Clinic on May 19, 2009, and her diagnoses were continued as major depressive disorder, recurrent, moderate; and anxiety disorder not otherwise specified.  (R. 389-92).  Her GAF was scored as 62.  (R. 391).  Her Cymbalta and propranolol were continued.  (R. 391-92).

Sartin returned to Alternative Medicine of Tulsa on May 21, 2009 to get her Norco refilled.  (R. 282).  Sartin returned in June for refills.  (R. 281).  The hand-written notes are not completed clear, but it appears that she was given a referral to pain management.  *Id.*  Sartin was seen again from June to October.  (R. 278-80, 328-35).

Sartin returned to the OU Psychiatry Clinic on June 16, 2009, and she said that she was experiencing daily panic attacks.  (R. 384-87).  Her diagnoses were major depressive disorder, recurrent, in partial remission; and anxiety disorder not otherwise specified.  (R. 386).  Her GAF was scored as 65.  *Id.*  Her Cymbalta was increased.  (R. 386-87).  On July 21, 2009, Sartin was

seen by Benjamin Crawford, D.O.  (R. 380-83).  She wanted to try Savella and taper Cymbalta.
*Id.*

The administrative transcript includes a record of J.E. Block, M.D., PACP that indicates that he saw Sartin for a second opinion on July 29, 2009.  (R. 468-69).  Dr. Block's impressions were fibromyalgia, chronic pain, gastroesophageal reflux disease, and insomnia.  (R. 469).

At an appointment with Dr. Crawford at the OU Psychiatry Clinic on August 25, 2009, Sartin restarted Cymbalta.  (R. 376-79).

Sartin was seen by Traci L. White, M.D. at Pain Management of Tulsa on September 15, 2009, and an instant drug screen done that day was positive for methamphetamine and marijuana. (R. 338-41, 351).  Dr. White said that Sartin had a long history of diffuse pain, but headaches, neck pain, and right arm pain were about 60-70% of her pain.  (R. 338).  On examination, Sartin had normal range of motion of her neck, with tenderness to palpation.  (R. 340).  Her arms had normal reflexes and strength, with some decreased sensation over the forearm of her right arm at the skin graft.  *Id.*  Range of motion was normal, but there were multiple tender points.  *Id.* Sartin had multiple tender points on examination of her hips and knees along with some left-sided pain on toe walking, with normal heel walking.  *Id.*  Assessments were occipital neuralgia, chronic daily headache, migraine headache, spinal enthesopathy, and fibromyalgia.  *Id.*  Dr. White's plan included increased exercise, decrease of narcotic medication to prevent rebound headaches, and continuation of her non-narcotic prescriptions, and discontinuation of smoking. (R. 341).  Dr. White said that she would not prescribe narcotic medications due to the positive drug screen.  *Id.*

Sartin was seen by Dr. Crawford at the OU Psychiatry Clinic on September 22, 2009, and she reported that she felt better since increasing Cymbalta.  (R. 371-74).  Sartin's diagnoses were

major depressive disorder, recurrent, in full remission; and anxiety disorder not otherwise specified.  (R. 373).  Her GAF was scored as 69.  *Id.*

A drug screen performed when Sartin returned to see Dr. White on September 29, 2009 was negative for all substances.  (R. 350).  Dr. White performed a bilateral greater occipital nerve block.  (R. 342).  Sartin's neck and right arm pain were her primary concern, and she described the pain as 10/10, stabbing, aching, and deep in nature.  (R. 343).  In addition to her previous assessments, Dr. White assessed right upper extremity radicular pain.  *Id.*  Dr. White gave Sartin a prescription for Norco, but told Sartin that it was likely a one-time refill, and Sartin needed to work on weight loss and physical activity to treat her chronic pain.  *Id.*

Sartin returned to see Dr. White on October 16, 2009, and Dr. White did myofascial trigger point injections "involving the trapezius and levator scapula muscles on the right at five points."  (R. 345).  Assessments were cervical myofascial pain, migraine headaches, chronic daily headaches, spinal ethesopathy, fibromyalgia, right upper extremity pain, and depression.  (R. 346).  Dr. White prescribed Diclofenac and Baclofen in addition to continuing ranitidine.  *Id.*  She also agreed to a proposed increase of Cymbalta prescribed by Sartin's psychiatrist.  *Id.*

Sartin was seen by Dr. Crawford at the OU Psychiatry Clinic on October 20, 2009.  (R. 367-70).  Her Cymbalta dosage was increased and Trazodone was added to address her insomnia.  (R. 369-70).  She was seen again November 24, 2009, and her medications were continued.  (R. 363-66).  On January 19, 2010, Sartin's Cymbalta was increased in an attempt to target her fibromyalgia pain.  (R. 359-62).

On February 5, 2010, Sartin returned to Dr. White, who adjusted her medications.

Sartin presented to Alternative Medicine of Tulsa on February 16, 2010 to complete disability paperwork.  (R. 406).  A form titled "Fibromyalgia Tender Points" was completed by

the nurse practitioner, showing 16 of 18 positive points.  (R. 405).  Sartin was seen at this clinic through August 2010.  (R. 396-404).

Sartin returned to the OU Psychiatry Clinic on February 18, 2010 and was seen by Dr. Crawford.  (R. 355-58).  Diagnoses were major depressive disorder, recurrent, mild; and anxiety disorder not otherwise specified.  (R. 357).  Her GAF was scored as 65.  *Id.*  Her medications were continued.  *Id.*

On March 2, 2010, Dr. White did six injections in trigger points in paracervical and rhomboid muscles.  (R. 438).  Dr. White's assessments were other chronic pain; chronic daily headaches; migraine headaches; fibromyalgia; spinal enthesopathy; cervical myofascial pain; and depression.  (R. 436-37).  Dr. White noted a discussion with Sartin regarding the amount of Norco prescribed and Dr. White's concern that "narcotic medication can lead to rebound headaches."  (R. 437).

At the OU Psychiatry Clinic on March 18, 2010, Sartin was diagnosed with major depressive disorder, recurrent, mild; and anxiety disorder not otherwise specified.  (R. 421-25).  Her GAF was scored as 62.  (R. 423).  Wellbutrin was added, and her other medications were continued.  (R. 424).

Sartin presented to Dr. White on April 6, 2010 with complaints of increased pain.  (R. 434-35).  Assessments were other chronic pain; chronic daily headaches; migraine headaches; spinal enthesopathy; fibromyalgia; and right upper extremity paresthesias.  (R. 435).  Dr. White ordered EMG/nerve conduction testing of Sartin's right arm, and Dr. White continued medications.  *Id.*  She added ibuprofen 800 mg for arthritic pain.  *Id.*

At the OU Psychiatry Clinic on April 15, 2010, Sartin's Wellbutrin was increased, but Dr. Crawford noted that he suspected her residual depression was pain-related.  (R. 416-20).  On

June 29, 2010, her medications were continued with no changes.  (R. 411-15).

Sartin presented to Dr. White on May 6, 2010 with new right hip and leg pain.  (R. 432-33).  Assessments were other chronic pain; chronic daily headaches; migraine headaches; spinal enthesopathy; fibromyalgia; right upper extremity paresthesias; lower back pain with right lower extremity symptoms.  (R. 433).  Dr. White prescribed a Medrol Dosepak to see if this improved Sartin's lower back pain.  *Id.*  She continued Sartin's other medications.  *Id.*  Dr. White performed a lumbar epidural steroid injection at L5/S1 on June 30, 2010.  (R. 430-31).

Dr. Crawford completed a Mental Status Form on July 19, 2010.  (R. 354).  Dr. Crawford said that Sartin was being treated for major depressive disorder, anxiety not otherwise specified, fibromyalgia, and panic disorder.  *Id.*  He said that Sartin had a "very good prognosis" and was responding to treatment.  *Id.*  He said that Sartin's fibromyalgia was persistent and not in remission.  *Id.*  He said that Sartin could remember, comprehend, and carry out instructions on an independent basis and could respond to work pressure, supervision, and coworkers.  *Id.*

Dr. White performed lumbar epidural steroid injections at L5/S1 on August 5, 2010. (R. 428-29).  Sartin presented to Dr. White on August 17, 2010 for follow up.  (R. 426-27). Assessments were other chronic pain; chronic daily headaches; migraine headaches; spinal ethesopathy; fibromyalgia; right upper extremity paresthesias; and "lower back pain with right lower extremity symptoms that have improved since her last epidural steroid injection."  *Id.*  Dr. White continued Sartin's medications, but said that she wanted to wean Sartin from the Norco starting at the next appointment.  (R. 427).

Records show that Sartin was seen at Grand Lake Mental Health Center ("GLMHC") for case management services in December 2010 and January 2011.  (R. 546-63).  Sartin was seen for pharmacological management on February 16, 2011 by a nurse practitioner and was started

on Cymbalta, propranolol,[4] and Elavil.  (R. 504-05).  Diagnoses were major depressive affective disorder, single episode, severe, without psychotic features; and generalized anxiety disorder.[5] (R. 505).  On March 28, 2011, Elavil was discontinued due to side effects, and Doxepin was started to address insomnia.  (R. 500-01).

Sartin returned to see Dr. White on May 2, 2011, and her assessments were other chronic pain; chronic daily headaches; migraine headaches; spinal enthesopathy; fibromyalgia; right upper extremity paresthesias; and lower back pain with bilateral lower extremity radicular pain. (R. 526-27).  Dr. White discontinued Lyrica and added Neurontin.  (R. 526).  On May 10, 2011, Dr. White performed a repeat epidural steroid injection.  (R. 524).  Dr. White corresponded with the nurse practitioner at Alternative Medicine of Tulsa on June 20, 2011 that Sartin had discontinued care with her office.  (R. 523).

At GLMHC on June 2, 2011, Sartin's medications were changed to propranolol, Cymbalta, and Wellbutrin.  (R. 496-97).

While the date is not completely clear, it appears that Sartin may have returned to Dr. Block on June 16, 2011.  (R. 466-67).  The hand-written notes on this record are not clear.  *Id.*

Sartin was seen for pharmacological management at GLMHC again in June and July 2011.  (R. 492-95).

Sartin was seen at Dr. Block's office on August 11, 2011.  (R. 535-37).

---

[4] Propranolol is the generic for Inderal.  www.pdr.net.  Sartin's health care providers used both terms, and the Court has used propranolol for the sake of consistency.

[5] Diagnoses were indicated by DSM-IV codes 296.23 and 300.02.

Agency consultant Seth Nodine, M.D. examined Sartin and prepared a report dated June 30, 2009.  (R. 252-60).  On examination, Dr. Nodine found Sartin to be neurologically intact.  (R. 254).  Sartin complained of pain in the thoracic paraspinous muscles, right forearm, bilateral thighs and buttocks with palpation.  *Id.*  She was not tender to palpation in the cervical or lumbar paraspinous muscles, calves, feet or ankles.  *Id.*  Dr. Nodine noted that there was evidence of skin graft and slight atrophy of the right forearm, but grip strength was normal and equal to the left.  *Id.*  Dr. Nodine's first assessment was "[c]hronic pain/fibromyalgia by history/depression/anxiety/headaches" as described in his report.  *Id.*  Other assessments were obesity and gastroesophageal reflux disease.  *Id.*  The range of motion sheets showed all results to be within normal limits.  (R. 255-56).  The hand/wrist sheet showed normal range of motion, and Dr. Nodine said that Sartin could effectively oppose the thumb to fingertips, could manipulate small objects, and could effectively grasp tools such as a hammer.  (R. 257).  The backsheet showed normal range of motion for the lumbosacral spine, but pain on motion.  (R. 258).  For the cervical spine, again there was normal range of motion, but pain.  *Id.*  For both the lumbar and cervical spine, there was tenderness, but no muscle spasm.  *Id.*

Agency nonexamining consultant Sharon Taber, Ph.D., completed a Psychiatric Review Technique Form on August 25, 2009.  (R. 261-74).  The first page of this form indicated that Dr. Taber found Sartin's impairments not severe and found that coexisting nonmental impairments required referral to another medical specialty.  (R. 261).  For Listing 12.04, Dr. Taber noted Sartin's mood disturbance with depressive syndrome.  (R. 264).  For Listing 12.06, Dr. Taber noted Sartin's anxiety disorder not otherwise specified.  (R. 266).  For the "Paragraph B

Criteria,"[6] Dr. Taber found that Sartin had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 271).  In the "Consultant's Notes" portion of the form, Dr. Taber noted the April 21, 2009[7] treatment session of Sartin at the OU Psychiatry Clinic and the diagnoses of major depressive disorder, recurrent, moderate, and anxiety disorder not otherwise specified.  (R. 273).  Dr. Taber noted Sartin's activities of daily living and then concluded that Sartin "does not appear to be significantly limited by mental problems."  *Id.*

### Procedural History

Sartin filed applications in December 2006 for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  (R. 113-23).  Sartin alleged onset of disability as of September 30, 2008.  (R. 113). The applications were denied initially and on reconsideration.  (R. 60-68, 77-82).  A hearing before ALJ Charles Headrick was held on November 29, 2010.  (R. 34-52).  By decision dated December 8, 2010, the ALJ found that Sartin was not  disabled.  (R. 14-23).  On December 22, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-7).  Thus, the decision of

---

[6] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

[7] Dr. Taber referred to this as an April 30, 2009 psychiatric examination, but the correct date is April 21, 2009.  (R. 203-07).  These records were apparently printed on April 30, 2009 when they were submitted for the Social Security disability proceedings, and this appears to be the source of the confusion regarding the date of this examination.

the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[8]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

---

[8] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Sartin met insured status requirements through March 31, 2010.  (R. 16).  At Step One, the ALJ found that Sartin had not engaged in substantial gainful activity since her alleged onset date of September 30, 2008.  *Id.*  At Step Two, the ALJ found that Sartin had severe impairments of fibromyalgia, chronic headaches, obesity, and myofascial pain.  *Id.*  At Step Three, the ALJ found that Sartin's impairments did not meet any Listing.  (R. 18).

The ALJ determined that Sartin had the RFC to perform the full range of medium work.  (R. 19).  At Step Four, the ALJ found that Sartin could perform her past relevant work.  (R. 21).  As an alternative finding, at Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Sartin could perform, considering her age, education, work experience, and RFC.  (R. 21-22).  Thus, the ALJ found that Sartin was not disabled from September 30, 2008 through the date of the decision.  (R. 22).

**Review**

Sartin argues that the ALJ's decision was flawed at Steps Four and Five because the ALJ did not include any mental limitations in his RFC.  Sartin also argues that the ALJ failed to properly evaluate the effect of her obesity.  Finally, Sartin argues that the ALJ's credibility assessment was not adequate.  Regarding the issues raised by Sartin, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

**Failure to Include Mental Limitations in the RFC Determination**

Sartin argues that the ALJ was required to include mental limitations in his RFC determination, even if he found that Sartin's mental impairments were nonsevere.  Plaintiff's Opening Brief, Dkt. #17, pp. 2-3.  Sartin's arguments are scattered.  She says that her mental condition did improve, but she asserts it then worsened, and the ALJ failed to note that decline.  She says that she was assigned GAF scores in the 40s.  She says that her mental impairments and her pain affected her activities of daily living.  She says that even if her mental impairments were nonsevere, they still had to be included in the hypothetical.  She does not suggest what limitations resulted from these nonsevere mental impairments and therefore should have been included in the RFC determination and in the hypothetical question to the vocational expert.

Sartin's arguments are not persuasive, and a review of the ALJ's decision confirms that his decision not to include any mental limitations in the RFC determination was supported by substantial evidence.  At Step Two of his decision, the ALJ reviewed the medical evidence concerning Sartin's depression, noting that it had been controlled with medication.  (R. 16-17).  In making his determination that her mental impairments were nonsevere, the ALJ considered the Paragraph B Criteria.  (R. 17-18).  He concluded that she had no more than mild limitation in all

three functional areas, and there was no evidence of an episode of decompensation.  (R. 18).  He therefore concluded her mental impairments were nonsevere.  *Id.*  In the portion of his decision discussing his RFC determination, the ALJ reviewed the records of the OU Psychiatry Clinic, where Sartin was treated from December 2008 to June 2010.  (R. 20, 203-17, 223-26, 234-39, 355-74, 376-87, 389-92, 389-92, 411-25).  He noted GAF scores in the 60s, together with notes that symptoms were in remission or were improving.  *Id.*  All of this is substantial evidence that supports the ALJ's decision.

Sartin's several one-sentence assertions are perfunctory and deprive the Court of the ability to meaningfully analyze them.  They are therefore waived.  *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).  Even without a finding of waiver, these truncated arguments are not persuasive.  First, Sartin's assertion that her mental condition worsened is arguable, at best.  She cites records from the OU Psychiatry Clinic, but the undersigned does not construe those records as showing a worsening of Sartin's depression or anxiety.  (R. 411-425).  For example, on April 15, 2010, Dr. Crawford increased the dosage of Wellbutrin, but he noted that he suspected that Sartin's residual depression was related to her pain.  (R. 416-20).  In one of the records cited by Sartin, her GAF was scored as 62.  (R. 423).

Sartin then cited to records from GLMHC from February 2011 through July 2011, a period of time after the ALJ's decision in December 2010.  During this time the nurse practitioner at GLMHC who treated Sartin for pharmacological management used only two numerical codes for diagnoses: one, 296.23, which correlates to major depressive disorder, single episode, severe, without psychotic features, and a second, 300.02, which correlates to generalized anxiety disorder.  (R. 492-97, 505).  The undersigned views the six-month period during which Sartin was treated at GLMHC not as a worsening of her psychological symptoms, but as a period

where a second practitioner used different diagnoses to characterize her conditions.  There is no evidence contained in the records of GLMHC that suggest a worsening in the severity of her mental condition.  Because these records were created after the ALJ's decision, he obviously was not obligated to review them, and they do not overcome the substantial evidence on which he based his decision.

Sartin cites to three pages of the administrative transcript where she says that she was assigned GAF scores in the 40s.  (R. 483, 551, 568).  These are from two documents entitled "Outpatient Request for Prior Authorization" that state that they were completed on January 31, 2011 and July 19, 2011.  (R. 483, 551, 568).  These documents appear to have been prepared by Valorie Nagy at GLMHC, and Ms. Nagy appears to have been a case manager and not a physician.  (R. 482, 550, 567).  These two documents, prepared well after the ALJ's decision in December 2010, do not undermine the substantial evidence on which he based his decision.

After making the unpersuasive arguments related to Sartin's nonsevere mental impairments, Sartin shifts to state that the ALJ's hypothetical was improper because it did not specify exertional limitations.  Plaintiff's Opening Brief, Dkt. #17, pp. 3-4.  First, the ALJ decided Sartin's case at Step Four.  (R. 21).  Therefore, with Sartin's allegations of error at Step Four found to be unpersuasive, there is no reason to reach this Step Five argument.  *See Qualls v. Astrue*, 428 Fed. Appx. 841, 851 (10th Cir. 2011) (unpublished).  Second, even if the Court did reach this argument, it has no merit.  *Id.* at 850-51.  This Court addressed this argument at some length in *Wallace v. Astrue*, 2012 WL 4052533 *9 (N.D. Okla).

The ALJ's RFC determination was supported by substantial evidence and was in compliance with legal requirements.

**Obesity**

Sartin structures her argument regarding her obesity as a separate one, but in essence she is asserting that her obesity resulted in some limitations that should have been included in the ALJ's RFC determination.  She does not suggest what limitations should have been included other than to speculate that the ALJ should have considered "how her obesity may affect her low back pain, and enhance her depression and anxiety."  Plaintiff's Opening Brief, Dkt. #17, p. 4.

Sartin was accompanied by an attorney at the hearing before the ALJ.  In a case where the claimant is represented, the ALJ is entitled to rely on a claimant's counsel to present and structure the case in such a way as to adequately explore all claims.  *Wall*, 561 F.3d at 1062; *Hawkins v. Chater*, 113 F.3d 1162, 1167-68 (10th Cir. 1997)*.*  The ALJ asked Sartin her height and weight at the beginning of the hearing.  (R. 39).  After preliminary questions from the ALJ, Sartin's attorney asked her questions.  (R. 41-45).  The attorney never asked any questions regarding Sartin's obesity and the effect that her obesity had on her ability to do work-like functions.  *Id.*  The ALJ included obesity as a severe impairment at Step Two and noted that Sartin's body mass index was 37.58 when she first went to the OU Clinic on November 12, 2008.  (R. 16).  Sartin does not cite to a single page of the administrative transcript that contains any reference to Sartin's obesity having an effect on her physical or mental abilities.  In these circumstances, the ALJ was not required to specifically discuss Sartin's obesity further in his decision.  *See Briggs v. Astrue*, 221 Fed. Appx. 767, 770-71, 837-38 (10th Cir. 2007) (unpublished) (declining to find error in ALJ's discussion of claimant's obesity when claimant "did not address his obesity either in his application for benefits or at the hearing before the ALJ").

There was no error in the ALJ's discussion of Sartin's obesity.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.  "[C]ommon

sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*,

695 F.3d 1156, 1167 (10th Cir. 2012).

After an introductory sentence,[9] the ALJ first discussed Sartin's depression and the

reasons why he found it to be a nonsevere impairment.  (R. 20).  The ALJ then discussed the

physical medical evidence, beginning with Sartin's complaints of right arm pain in November

2008.  *Id.*  He emphasized the imaging studies done in 2009 and 2010 of many parts of Sartin's

body, most of which were entirely negative or showed only mild degenerative changes.  *Id.*  He

did mention Sartin's diagnosis of fibromyalgia.  *Id.*

---

[9] Sartin faults the introductory language used by the ALJ: "After careful consideration of
the evidence, the undersigned finds that the claimant's medically determinable impairments
could reasonably be expected to cause the alleged symptoms; however, the claimant's statements
concerning the intensity, persistence and limiting effects of these symptoms are not credible to
the extent that they are inconsistent with the above residual functional capacity assessment."  (R.
20).  While this language might have been "meaningless boilerplate," it was merely an
introduction to the ALJ's analysis and was not harmful.  *See Keyes-Zachary*, 695 F.3d at 1170
(use of boilerplate language in a credibility assessment is problematic only "in the absence of a
more thorough analysis") (further quotations omitted).

The ALJ then mentioned several statements Sartin made, either in her testimony or in papers filed with the Social Security Administration, and he pointed out that some of Sartin's statements were inconsistent.  (R. 20-21).  For example, he contrasted Sartin's statement in a function report that she could handle most of the household chores with her testimony that she did very little around the house.  *Id.*  Pointing out inconsistencies in the claimant's statements is obviously a specific reason that supports a finding of reduced credibility.  *Harris v. Astrue*, 2012 WL 3893128 at *4 (10th Cir.) (unpublished), *citing* SSR 96-7p, 1996 WL 374186 at *5.  The ALJ concluded this paragraph of his decision with a statement that "[t]he laboratory and radiology reports, along with the physical examinations, reveal that the claimant's alleged impairments are not as serious as she claims."  (R. 21).  Inconsistencies of the claimant's complaints compared to the objective medical evidence is also a legitimate consideration.  *See* 20 C.F.R. § 404.1529(c)(4) ("we will evaluate your statements in relation to the objective medical evidence").

Inconsistencies in some of Sartin's statements and the failure of some of her claims to be consistent with the objective medical evidence are two reasons that are legitimate and are closely connected to substantial evidence that supports the ALJ's conclusion that Sartin was less than fully credible.  The Court finds that the remainder of the ALJ's discussion does not support his credibility assessment because these paragraphs are either boilerplate[10] or they are conclusions

---

[10] The following provisions in the ALJ's decision appear to be boilerplate provisions. The Court finds them difficult to decipher, and they certainly do not meet the standard of specific reasons closely linked to substantial evidence.

The [ALJ] finds that the claimant's reported activities are not indicative of her complaints of totally disabling pain.  Therefore, the degree of pain alleged to be disabling cannot be found as fact by the undersigned.

that do not specify the facts on which they are based.  (R. 21).  For example, the ALJ said that

Dr. Nodine "found that [Sartin's] allegations were not supported by his findings."  *Id.*  The

undersigned has reviewed Dr. Nodine's report, and that physician did not include a sentence

stating that Sartin's complaints were not supported by his findings, and this would indeed by an

unusual statement for an examining physician to make.  The undersigned assumes that the ALJ

meant that he, the ALJ, concluded that Sartin's complaints were not reflected in Dr. Nodine's

findings, but unfortunately the ALJ failed to give any factual examples.  This is a "conclusion in

the guise of findings" that is prohibited.  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir.

2005).

In Sartin's case, in spite of the ALJ's unsupported conclusions and his use of boilerplate

provisions, the Court is "persuaded that the ALJ's credibility determination is closely and

affirmatively linked to substantial evidence."  *Miller v. Astrue*, 2012 WL 4076128 at *4 (10th

Cir.) (unpublished).  In *Miller*, the Tenth Circuit rejected arguments that the ALJ used boilerplate

language and "failed to state which of [her] statements he accepted as true and which he

considered not credible."  *Id.* at *3.  The court found that, although the ALJ used "disfavored

language," he set forth the specific evidence he relied on in evaluating the claimant's credibility,

and this satisfied the legal requirements.  *Id.* at *4.  This Court makes the same conclusion in

---

> Therefore, the alleged effect of the claimant's symptoms on activities of daily
> living and basic task performance is not consistent with the total medical and non-
> medical evidence in the file.  The claimant's statements about her impairments
> and their impact on her ability to perform activities of daily living and basic
> functions are not entirely credible in light of discrepancies between the claimant's
> alleged symptoms and objective documentation in file.  The physical findings and
> supporting clinical data do not closely corroborate or correlate with the claimant's
> subjective complaints.

(R. 21).

Sartin's case, because, as in *Miller*, the ALJ here gave legitimate reasons for finding Sartin less than credible, and those reasons were supported by substantial evidence.  The Court therefore rejects Sartin's arguments, rejected by the Tenth Circuit in *Miller*, based on boilerplate provisions and on failure to specify what portions of Sartin's testimony he accepted as true.

Sartin complains that the ALJ's discussion of inconsistencies in Sartin's claims was a selective discussion.  Plaintiff's Opening Brief, Dkt. #17, p. 6.  Her point seems to be that she also made statements regarding the side effects of her medications that were consistent.  Surely Sartin is not suggesting that an ALJ is required to review the 95% (as a theoretical example) of a claimant's testimony that was consistent in order to be able to use the 5% that was inconsistent as one reason supporting a finding of reduced credibility.  If that is what Sartin is suggesting, the undersigned rejects that suggestion as nonsensical.  The prohibition against selective discussion of only those facts that support a finding of nondisability is not applicable in the instance in which an ALJ finds a limited number of the claimant's statements to be inconsistent.

While Sartin's argument is not completely clear, she may be suggesting that the ALJ's discussion of Sartin's side effects was not comprehensive, and that the ALJ should have given a more thorough discussion of side effects.  *Id.*  The ALJ noted that Sartin testified that Cymbalta and Lyrica made her sleepy, and he noted that she had made other statements that were arguably inconsistent with that testimony.  (R. 20).  The ALJ did not make any other factual summary of any side effects suffered by Sartin, but he was not required to, because Sartin did not testify regarding any others.  (R. 41-44).  She was asked multiple questions by her counsel regarding the side effect of sleepiness, but he did not ask her about any other side effects.  *Id.*  The ALJ was not required to scour the record to find the entries cited by Sartin where she reported various side effects to her physicians.  When the Tenth Circuit and other courts have criticized administrative

decisions for ignoring side effects of medications, they did not intend to require an ALJ to mention every single side effect that is mentioned in the record, especially when many of the side effects are minor. For example, Sartin complains that the ALJ did not mention that some medications caused dry mouth and constipation. Plaintiff's Opening Brief, Dkt. #17, p. 6. The Court assumes that Sartin is not suggesting that these side effects caused her to be disabled. Her own counsel, at the hearing before the ALJ, inquired only as to which medications caused her to be sleepy, so he obviously did not consider dry mouth and constipation to be side effects that required inquiry. The ALJ did not commit reversible error by omitting a discussion of side effects beyond the testimony elicited by Sartin's own counsel.

The undersigned notes that counsel for Sartin have made the statement that "[i]t is error for the ALJ to miscast the evidence of record," citing *Alexander v. Barnhart*, 74 Fed. Appx. 23, 26-27 (10th Cir. 2003). Plaintiff's Opening Brief, Dkt. #17, p. 6. In *Alexander*, the Tenth Circuit said that because a statement made by the ALJ was a misstatement of what a physician "in fact said," and therefore the misstatement could not "stand as substantial evidence of medical improvement." *Id.* Here, Sartin's suggestion is that the ALJ "miscast the evidence" by failing to discuss every single side effect that the claimant mentioned to a physician. This is obviously a very different situation from the one the Tenth Circuit criticized in *Alexander*, where the ALJ made an affirmative statement that misstated what a physician had said. The undersigned finds that Sartin's citation to *Alexander* is not on point. Further, the undersigned notes that the law firm representing Sartin has an active practice in the field of Social Security disability and further notes that a large number of the briefs the firm files before this Court include this statement regarding miscasting evidence. The Court has previously criticized counsel for making this assertion erroneously. *Tietjen v. Astrue*, 2012 WL 3308399 at *16 (N.D. Okla.). The Tenth

Circuit has rejected this argument and pointed out that counsel made it erroneously. *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 824 (10th Cir. 2011) (unpublished); *Kruse v. Astrue*, 436 Fed. Appx. 879, 886-87 (10th Cir. 2011) (unpublished); *see also Storie v. Astrue*, 2011 WL 2446855 at *7 (N.D. Okla).  The undersigned again suggests to these attorneys that they be more careful in making this argument, especially where, as here, the situation bears little resemblance to the facts of *Alexander*.

Sartin criticizes the ALJ's use of her statements regarding the extent of her abilities as one basis for his credibility assessment.  Plaintiff's Opening Brief, Dkt. #17, p. 7.  She says that the ALJ mischaracterized the statements she made on the function report by failing to note that she often referred to spacing out her activities or needing help to do her activities.  *Id.*  The function report is a form that Sartin completed with hand-written responses, and the relevant portion, regarding Sartin's daily activities, was several pages long.  (R. 155-62).  Sartin went into some detail, which the form requested.  *Id.*  The ALJ was not required to recite verbatim what Sartin wrote on this form.  After reading all of what Sartin wrote, the undersigned is convinced that the ALJ's characterization was generally true: "In the function report, she stated that she was able to take care of her kids and handle most of the household chores."  (R. 20).  His next sentence gives the contrast of what Sartin wrote on the function report with her testimony: "During the testimony, she stated that she did very little around the house and slept a lot."  (R. 20-21).  This statement by the ALJ was again a summary of several pages of testimony, but the undersigned finds that it was an accurate generalization.  Sartin's testimony emphasized the number of her naps and her need to lie down during the day.  (R. 41-45).  This was in contrast to Sartin's description in the function report of what she did from when she woke up until she went to sleep, which did not mention lying down or napping.  (R. 155, 162).  Sartin's description of

what she did during the day mentioned sitting with her corn pillow, but not lying down with it.

*Id.*  When asked by the ALJ if she prepared an evening meal for her family, Sartin replied

"[u]sually my husband does all the cooking and cleaning?"  (R. 45).  She said she cooked "a little

bit" and she said she did "very little" of the housework.  *Id.*  Again, this contrasted with the

general thrust of the information on the function report which said that Sartin prepared meals

daily "unless I have help from family," and she did cleaning, dishes, and laundry and "sometimes

family helps do some things."  (R. 157).  The ALJ condensed information into two brief

sentences, but his point was valid and was supported by the information on the function report

and by Sartin's testimony.  His point was that there was a considerable difference in the degree of

disability Sartin described in her function report when compared to her testimony.

Sartin then attempts to attack the ALJ's credibility assessment by stating that the ALJ

used Sartin's activities of daily living to conclude that she did not have disabling levels of pain.

Plaintiff's Opening Brief, Dkt. #17, p. 7.  Sartin is correct that some of the ALJ's language,

quoted in footnote 9 above, refers to Sartin's activities of daily living.  This language, however,

is rejected by the undersigned as impermissible boilerplate, as explained above.  Sartin's attacks

on this portion of the ALJ's decision, therefore, are moot.

Sartin also attacks that part of the ALJ's decision where he stated that the "laboratory and

radiology reports, along with the physical examinations, reveal that [Sartin's] alleged

impairments are not as serious as she claims."  (R. 21).  Sartin argues that it is improper for an

ALJ to disregard a claimant's testimony about the severity of her symptoms "solely because they

are not supported by objective medical evidence."  Plaintiff's Opening Brief, Dkt. #17, p. 8.

Even if this is a correct legal principle, it does not apply here, because the ALJ did not rely solely

on the contrast between Sartin's claims and the objective medical evidence, but also used

inconsistencies in Sartin's own statements as a reason supporting his finding of reduced credibility.

Sartin devotes a substantial portion of her brief arguing that the ALJ ignored evidence that supported a finding of full credibility.  Plaintiff's Opening Brief, Dkt. #17, pp. 8-11.  For example, Sartin says that the ALJ ignored her numerous trips to doctors and specific findings such as an arm tremor and weak grip.  *Id.*  The Tenth Circuit rejected a similar argument that the ALJ erred by failing to consider the claimant's "motivation to work" as a positive credibility factor when the claimant had attempted to work for three months.  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1173 (10th Cir. 2012).  The court said that the ALJ's failure to consider this evidence did not constitute reversible error.  *Id.*  Here, none of Sartin's arguments that the ALJ was required to consider certain positive factors establishes reversible error, and the ALJ's credibility assessment remains supported by substantial evidence.  *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence).

Finally, in this section of her brief, Sartin argues that it was error for the ALJ to fail to mention a letter from Sartin's husband included in the administrative transcript.  (R. 201).  The Tenth Circuit has often stated that the court takes the ALJ at his word when he states that he has considered all of the evidence.  *Wall*, 561 F.3d at 1070.  Here, the ALJ stated that he considered all of the evidence, including all of the opinion evidence.  (R. 14, 19).  There is no reason to believe that the ALJ failed to take into consideration the letter from Sartin's husband in making his decision.  In any event, the letter from Sartin's husband was not of such importance that the ALJ was required to specifically discuss it.  *See Keyes-Zachary*, 695 F.3d at 1173 (failure in one aspect of ALJ's credibility discussion "would not have affected the outcome in this case.  The

alleged error is harmless."); *see also Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir.

2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was

not of such quality as to require discussion).

"In sum, the ALJ closely and affirmatively linked his adverse credibility finding to

substantial evidence in the record and did not employ an incorrect legal standard.  'Our

precedents do not require more, and our limited scope of review precludes us from reweighing

the evidence or substituting our judgment for that of the agency.'"  *Zaricor-Ritchie*, 452 Fed.

Appx. at 824, *citing Wall*, 561 F.3d at 1070 (further quotations omitted).

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct

legal standards were applied.  The decision is **AFFIRMED**.

Dated this 8th day of March 2013.

Paul J. Cleary
United States Magistrate Judge